FEDERMAN & SHERWOOD
WILLIAM B. FEDERMAN
10205 North Pennsylvania Avenue
Oklahoma City, OK  73120
Telephone:  405/235-1560
405/239-2112 (fax)
WBF@federmanlaw.com

ROBBINS GELLER RUDMAN
 & DOWD LLP
STUART A. DAVIDSON
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com

*Interim Co-Lead Class Counsel*

[Additional counsel listed in signature block.]

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOLARA MEDICAL SUPPLIES DATA BREACH LITIGATION | Case No.: 3:19-cv-02284-H-KSC<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Juan Maldonado, Adam William Bickford, Jeffrey Harris, Alex Mercado, Thomas Wardrop, and Kristi Keally, as legal guardian of a minor child whose initials are M.K. (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendant Solara Medical Supplies, LLC, based on personal knowledge and the investigation of counsel, and allege as follows:

## I. INTRODUCTION

1. Between April 2, 2019 and June 20, 2019, cyber criminals infiltrated and accessed the inadequately protected computer systems of Defendant Solara Medical Supplies, LLC ("Solara" or "Defendant"), one of the largest direct-to-consumer suppliers of medical devices for the care of individuals with diabetes, and also a registered pharmacy in the State of California. The cyber criminals gained access to Solara's computer systems with the apparent intention of stealing company financial data and the protected personal information and protected health information of the tens of thousands of individuals whose information was stored on Defendant's computer systems (the "Data Breach"). Ultimately, the cyber criminals succeeded in stealing the sensitive personal information of over 114,000 of those individuals ("Breach Victims").

2. The personal information taken by the cyber criminals includes: names, addresses, dates of birth, Social Security numbers, Employee Identification Numbers, and, if that were not damaging enough to the Breach Victims, their personal and confidential medical information, health insurance information, passwords, PIN numbers, or account login information, billing and claims information, and Medicare and Medicaid IDs, as well as financial information, credit and debit card information, driver's licenses and state identification cards, passport information (collectively, "Personal and Medical Information").

3. In short, thanks to Defendant's gross negligence and failure to adequately protect the Breach Victims' Personal and Medical Information, cyber

criminals were able to steal everything they could possibly need to commit nearly every conceivable form of identity theft and wreak havoc on the financial and personal lives of potentially millions of individuals.

4.     Defendant's misconduct—failing to timely implement adequate and reasonable measures to ensure their computer systems and Plaintiffs' Personal and Medical Information were protected, failing to timely detect the breach, failing to take adequate steps to prevent and stop the breach, failing to disclose the material facts that they did not have adequate computer systems and security practices to safeguard the Personal and Medical Information, failing to honor their repeated promises and representations to protect the Breach Victims' Personal and Medical Information, and failing to provide timely and adequate notice of the Data Breach—caused substantial harm and injuries to Breach Victims across the United States.

5.     As a result of the Data Breach, Breach Victims suffered damages. For example, since the Data Breach, certain Plaintiffs have experienced spam telephone calls from persons with knowledge of their sensitive protected health information. Now that their Personal and Medical Information has been released into the criminal cyber domains, Plaintiffs and all Breach Victims are at imminent risk of identity theft. This risk will continue to exist for years to come, as Breach Victims must spend their time being extra vigilant, due to Defendant's failures, to try to prevent being victimized for the rest of their lives.

6.     Plaintiffs bring this class action lawsuit on behalf of a proposed nationwide class and alternative state subclasses to hold Defendant responsible for its grossly negligent—indeed, reckless—failure to use statutorily required or reasonable, industry cybersecurity measures to protect class members' Personal and Medical Information. (The term "Class" is used as defined in paragraph 150 below. References to "members of the Class" and "Breach Victims" are used interchangeably herein.).

consolidatedcomplaint

7.     Because Defendant presented such a soft target to cyber criminals, Plaintiffs and Class members have already been subjected to violations of their privacy, fraud, and identity theft, or have been exposed to a heightened and imminent risk of certainly impending fraud and identity theft. Plaintiffs and Class members must now and in the future, spend time to more closely monitor their financial accounts to guard against identity theft.

8.     Plaintiffs and Class members may also incur out-of-pocket costs for, among other things, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

9.     On behalf of themselves and all Breach Victims, Plaintiffs seek actual damages, statutory damages, and punitive damages, with attorneys' fees, costs, and expenses under the California Customer Records Act ("CCRA"), Cal. Civ. Code § 1798.80, *et seq.*, California Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code § 56, *et seq.*, California's Unfair Competition Law ("UCL"), Cal. Bus. Prof. Code § 17200, *et seq.*, and other state personal and medical privacy laws and state consumer protection and unfair and deceptive practices acts, and further sue Defendant for negligence, negligence *per se*, and breach of implied contract. Plaintiffs also seek injunctive relief, including significant improvements to Defendant's data security systems, future annual audits, Defendant-funded long-term credit monitoring services, and other remedies as the Court sees necessary and proper.

## II.     THE PARTIES

10.     Plaintiff Juan Maldonado is a citizen and resident of the City of Philadelphia, Pennsylvania, in Delaware County.

11.     Plaintiff Adam William Bickford is a citizen and resident of the City of Wolcott, Connecticut, in New Haven County.

12.     Plaintiff Jeffrey Harris is a citizen and resident of the City of Raleigh, North Carolina, in Wake County.

13.     Plaintiff Alex Mercado is a citizen and resident of the City of Long Beach, California, in Los Angeles County.

14.     Thomas Wardrop is a citizen and resident of Grand Rapids, Michigan, in Kent County.

15.     Kristi Keally is the legal guardian of M.K., and they are citizens and residents of Conway, Pennsylvania, in Beaver County.

16.     Defendant Solara Medical Supplies, LLC is a California limited liability company with its principal place of business in Chula Vista, California, in San Diego County. Upon information and belief, it is a citizen of California.

## III.    JURISDICTION AND VENUE

17.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

18.     This Court has diversity jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action involving more than 100 class members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and many members of the class are citizens of states different from Defendant.

19.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District, it regularly transacts business in this District, and many Class members reside in this District.

20.     Venue as to Defendant is proper in this judicial district under 28 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District and many of Defendant's acts complained of herein occurred within this District.

## IV.    FACTUAL ALLEGATIONS

21.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

**A.    Defendant**

22.    Defendant is the largest direct-to-patient supplier of advanced diabetic devices, including continuous glucose monitors, insulin pumps and other supplies for patients with diabetes.

23.    As part of Defendant's business, Defendant collects substantial amounts of Personal and Medical Information. The information Defendant collects qualifies as "Personal information" under the CCRA and other state data breach and information privacy acts, including the Pennsylvania Breach of Personal Information Notification Act, 73 Pa. Stat. § 2302, *et seq.* The medical information that Defendant collects qualifies as "Medical information" under the federal Health Information Portability and Accountability Act ("HIPAA"), the CMIA, and other state medical record protection acts.

**B.    The Data Breach**

24.    On or around November 13, 2019, Solara issued a press release (the "Notice") providing, for the first time, a public notice of "an incident that may affect the security of some information relating to certain individuals associated with Solara including current and former patients and employees."[1]

25.    In the Notice, Solara notified consumers that on June 28, 2019—***over four and a half months earlier***—it had "determined that an unknown actor gained access to a limited number of employee Office 365 accounts, from April 2, 2019 to June 20, 2019."

26.    This means that the cyber criminals had unrestricted access to the Personal and Medical Information of Plaintiffs and all Breach Victims for at least 79 days, from April 2 to June 20.

27.    The Notice went on to say that within five days of discovering the Data Breach, Solara confirmed (with assistance from third-party forensic experts) that

---

[1] "Solara Medical Supplies Provides Notice of a Data Breach," PR Newswire, Nov. 13, 2019, https://www.prenewswire.com/news-releases/solara-medical-supplies-provides-notice-of-a-data-breach-300957962.html.

Personal and Medical Information within those email accounts "may have been accessed or acquired by an unknown actor at the time of the incident."[2]

28.    Yet, despite knowing many patients were in danger, Defendant did nothing to warn Breach Victims until 136 days later—a delay of over four months, an unreasonable amount of time under any objective standard. During this time, the cyber criminals had free reign to surveil and defraud their unsuspecting victims. Solara apparently chose to complete its internal investigation and develop its excuses and speaking points before giving class members the information they needed to protect themselves against fraud and identity theft.

29.    After its "comprehensive manual and programmatic review," Defendant determined that:

> The personal information present in the accounts at the time of the incident varied by individual but may have included first and last names and one or more of the following data elements: name, address, date of birth, Social Security number, Employee Identification Number, medical information, health insurance information, financial information, credit / debit card information, driver's license / state ID, passport information, password / PIN or account login information, billing / claims information, and Medicare ID / Medicaid ID.[3]

This was a staggering coup for the cyber criminals and a stunningly bad showing for Defendant.

30.    It is apparent from Defendant's notice letters and press release that the Personal and Medical information contained within these Office 365 accounts was not encrypted.

31.    In spite of the severity of the Data Breach, Defendant has done very little to protect Breach Victims. In the Notice, Solara states that it is notifying Breach Victims "so that they may take further steps to best protect their information,

[2] *Id.*
[3] *Id.*

consolodatedcomplaint

*should they feel it is appropriate to do so*."[4]  In effect, shirking its responsibility for the harm it has caused and putting it all on the Breach Victims.

32.    Defendant Solara failed to adequately safeguard Plaintiffs and Class members' Personal and Medical Information, allowing the cyber criminals to access this wealth of priceless information for nearly two full months, and then use it for another four months before Solara warned the criminals' victims, the Breach Victims, to be on the lookout.

33.    Defendant Solara failed to spend sufficient resources on monitoring external incoming emails and training its employees to identify email-born threats and defend against them.

34.    Defendant had obligations created by HIPPA, the CMIA, reasonable industry standards, its own contracts with its patients and employees, common law, and its representations to Plaintiffs and Class members, to keep their Personal and Medical Information confidential and to protect the information from unauthorized access.

35.    Plaintiffs and Class members provided their Personal and Medical Information to Solara with the reasonable expectation and mutual understanding that Solara would comply with its obligations to keep such information confidential and secure from unauthorized access.

36.    Indeed, as discussed below, Solara promised Plaintiffs and Class members that it would do just that.

**C.    Defendant Expressly Promised to Protect Personal and Medical Information**

37.    Solara provides all patients, including Plaintiffs and Class members, its Notice of Privacy Practices. Solara's Notice of Privacy Practices states, as relevant:

> Solara Medical Supplies . . . is committed to protecting your   privacy   and   understands   the   importance   of

---

[4] *Id.* (emphasis added).

CONSOLIDATED CLASS ACTION COMPLAINT

safeguarding your personal health information. We are required by federal law to maintain the privacy of health information that identifies you or that could be used to identify you . . . .[5]

38. Likewise, Solara provides every patient a "Patient Bill of Rights" that assures the patients of their right to the confidentiality of all their records provided to, generated by, or retained by Solara:

The Client Bill of Rights is designed to recognize, promote, and protect, an individual's right to be treated with dignity and respect within the health care system. . . . As our client you have the right to . . . Confidentiality of your records and Solara Medical Supplies, LLC policy for accessing and disclosure of records.[6]

39. Similarly, Solara's privacy policy for its software application claimed that its data security practices met industry standards:

DATA SECURITY
The Company takes steps consistent with commercially reasonable industry standards to secure personal information collected from you from loss, misuse, unauthorized access and accidental destruction while under our control.[7]

40. Solara's website terms and conditions also promised Plaintiffs and the Class that their personal information would not be compromised:

Privacy
We keep your personal information private and secure. When you make a purchase from our site, you provide your name, email address, credit card information, address, phone number, and a password. . . . Our secure servers protect your information using advanced encryption techniques and firewall technology.[8]

---

[5] Solara Medical Supplies, "Notice of Privacy Practices," Effective Date: March 1, 2010, https://www.solara.com/privacy-policy (last accessed November 26, 2019).
[6] Solara Medical Supplies, "Patient Bill of Rights," https://www.solara.com/patient-bill-of-rights (last accessed November 26, 2019).
[7] https://www.solara.com/traceterms (last modified June 10, 2019).
[8] Solara, "Policies, Terms and Conditions," https://www.solara.com/terms-and-conditions (last accessed January 14, 2020).

-8-

41.    Notwithstanding the foregoing assurances and promises, Solara failed to protect the Personal and Medical Information of Plaintiffs and other Class members from cyber criminals using relatively unsophisticated means to dupe its employees, as conceded in the Notice and letters to Breach Victims.

42.    If Solara truly understood the importance of safeguarding patients' Personal and Medical Information, it would acknowledge its responsibility for the harm it has caused, and would compensate class members, provide long-term protection for Plaintiffs and the Class, agree to Court-ordered and enforceable changes to its cybersecurity policies and procedures, and adopt regular and intensive training to ensure that a data breach like this never happens again.

43.    Defendant's data security obligations were particularly important given the known substantial increase in data breaches in the healthcare industry, including the recent massive data breach involving LabCorp, Quest Diagnostics, and American Medical Collections Agency. And given the wide publicity given to these data breaches, there is no excuse for Solara's failure to adequately protect Plaintiffs and Class members' Personal and Medical Information.

44.    That information, is now in the hands of cyber criminals who will use it if given the chance. Much of this information is unchangeable and loss of control of this information is remarkably dangerous to consumers.

**D.    Defendant had an Obligation to Protect Personal and Medical Information under Federal and State Law and the Applicable Standard of Care**

45.    Defendant is an entity covered by HIPAA (45 C.F.R. § 160.102). As such, it is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

CONSOLIDATED CLASS ACTION COMPLAINT

46.    HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

47.    HIPAA's Security Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is health or transferred in electronic form.

48.    HIPAA requires Defendant to "comply with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

49.    "Electronic protected health information" is "individually identifiable health information . . . that is (i) Transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

50.    HIPAA's Security Rule requires Defendant to do the following:

a.    Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b.    Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c.    Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d.    Ensure compliance by its workforce.

51.    HIPAA also required Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e).

52.    HIPAA also required Defendant to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected

health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

53.    The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, also required Defendant to provide notice of the breach to each affected individual "without unreasonable delay and *in no case later than 60 days following discovery of the breach*."[9]

54.    Defendant was also prohibited by the Federal Trade Commission Act ("FTC Act") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.,* 799 F.3d 236 (3d Cir. 2015).

55.    As described before, Defendant is also required (by the CCRA, CMIA and various other states' laws and regulations) to protect Plaintiffs' and Class members' Personal and Medical Information, and further, to handle any breach of the same in accordance with applicable breach notification statutes.

56.    In addition to their obligations under federal and state laws, Defendant owed a duty to Breach Victims whose Personal and Medical Information was entrusted to Defendant to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Personal and Medical Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Breach Victims to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems and networks, and the

---

[9]Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added).

consolidatedcomplaint

personnel responsible for them, adequately protected the Personal and Medical Information of the Breach Victims.

57.     Defendant owed a duty to Breach Victims whose Personal and Medical Information was entrusted to Defendant to design, maintain, and test its computer systems and email system to ensure that the Personal and Medical Information in Defendant's possession was adequately secured and protected.

58.     Defendant owed a duty to Breach Victims whose Personal and Medical Information was entrusted to Defendant to create and implement reasonable data security practices and procedures to protect the Personal and Medical Information in their possession, including adequately training its employees and others who accessed Personal Information within its computer systems on how to adequately protect Personal and Medical Information.

59.     Defendant owed a duty to Breach Victims whose Personal and Medical Information was entrusted to Defendant to implement processes that would detect a breach on its data security systems in a timely manner.

60.     Defendant owed a duty to Breach Victims whose Personal and Medical Information was entrusted to Defendant to act upon data security warnings and alerts in a timely fashion.

61.     Defendant owed a duty to Breach Victims whose Personal and Medical Information was entrusted to Defendant to adequately train and supervise its employees to identify and avoid any phishing emails that make it past its email filtering service.

62.     Defendant owed a duty to Breach Victims whose Personal and Medical Information was entrusted to Defendant to disclose if its computer systems and data security practices were inadequate to safeguard individuals' Personal and Medical Information from theft because such an inadequacy would be a material fact in the decision to entrust Personal and Medical Information with Defendant.

consolodatedcomplaint

63.    Defendant owed a duty to Breach Victims whose Personal and Medical Information was entrusted to Defendant to disclose in a timely and accurate manner when data breaches occurred.

64.    Defendant owed a duty of care to Breach Victims because they were foreseeable and probable victims of any inadequate data security practices.

### E.    Defendant Was on Notice of Cyber Attack Threats and the Inadequacy of Its Data Security

65.    Defendant was on notice that companies in the healthcare industry were targets for cyberattacks.

66.    Defendant was on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[10]

67.    The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[11]

---

[10] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS (Aug. 2014), http://www.reuters.com/article/2014/08/20/us-cybersecurity-healthcare-fbi-idUSKBN0GK24U20140820.

[11] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASS'N (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomeware-attacks-shut-down-clinics-hospitals.

68.     As implied by the above quote from the AMA, stolen Personal and Medical Information can be used to interrupt important medical services themselves. This has already been the case for one of the named plaintiffs, Plaintiff Maldonado, and is an imminent and certainly impending risk for all Breach Victims.

69.     Defendant was on notice that the federal government has been concerned about healthcare company data encryption. Defendant knew it kept protected health information in its email accounts and yet did not encrypt its email accounts.

70.     The United States Department of Health and Human Services' Office for Civil Rights urges the use of encryption of data containing sensitive personal information. As long ago as 2014, the Department fined two healthcare companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan McAndrew, the DHHS's Office of Human Rights' deputy director of health information privacy, stated "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[12]

71.     As a covered entity or business associate under HIPAA, Solara should have known about its weakness toward email-related threats and sought better protection for the Personal and Medical Information accumulating in its employees' inboxes.

72.     In the healthcare industry, the number one threat vector from a cyber security standpoint is phishing. Cybersecurity firm Proofpoint reports that "phishing is the initial point of compromise in most significant [healthcare] security incidents, according to a recent report from the Healthcare Information and Management

---

[12]"Stolen Laptops Lead to Important HIPAA Settlements," U.S. Dep't of Health and Human Services (Apr. 22, 2014), available at https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

consolodatedcomplaint

Systems Society (HIMSS). And yet, 18% of healthcare organizations fail to conduct phishing tests, a finding HIMSS describes as 'incredible.'"[13]

73.    The report from Proofpoint was published March 27, 2019, and summarized findings of recent healthcare industry cyber threat surveys and recounted good, common sense steps that the targeted healthcare companies should follow to prevent email-related cyberattacks.

74.    One of the best protections against email related threats is security awareness training and testing on a regular basis. This should be a key part of a company's on-going training of its employees. "[S]ince phishing is still a significant, initial point of compromise, additional work needs to be done to further lower the click rate," the HIMSS report states. "This can be done through more frequent security awareness training, phishing simulation, and better monitoring of metrics pertaining to phishing (including whether there are any particular repeat offenders)."[14]

75.    ProtonMail Technologies publishes a guide for IT Security to small businesses (i.e., companies without the heightened standard of care applicable in the healthcare industry). In its 2019 guide, ProtonMail dedicates a full chapter of its ebook guide to the danger of phishing and ways to prevent a small business from falling prey to it. It reports:

> Phishing and fraud are becoming ever more extensive problems. A recent threat survey from the cybersecurity firm Proofpoint stated that between 2017 and 2018, email-based attacks on businesses increased 476 percent. The FBI reported_that these types of attacks cost companies around the world $12 billion annually.
>
> Similar to your overall IT security, your email security relies on training your employees to implement security best practices and to recognize possible phishing attempts. This must be deeply ingrained

---

[13]Aaron Jensen, *Healthcare Phishing Statistics: 2019 HIMSS Survey Results* (Mar. 27, 2019), https://www.proofpoint.com/us/security-awareness/post/healthcare-phishing-statistics-2019-himss-survey-results.
[14]*Id.*

CONSOLIDATED CLASS ACTION COMPLAINT

consolidatedcomplaint

into every staff member so that every time they check their emails, they are alert to the possibility of malicious action.[15]

76.     The guidance that ProtonMail provides non-healthcare industry small businesses is likely still not adequate for a company like Solara, with the heightened healthcare standard of care based on HIPAA, CMIA, and the increased danger from the sensitivity and wealth of Personal and Medical Information it retains, but ProtonMail's guidance is informative for showing how inadequately Solara protected the Personal and Medical Information of the Plaintiffs and the Class. ProofPoint lists numerous tools under the heading, "How to Prevent Phishing":

   a. **Training:** "Training your employees on how to recognize phishing emails and what to do when they encounter one is the first and most important step in maintaining email security. *This training should be continuous as well. . . .*"

   b. **Limit Public Information:** "Attackers cannot target your employees if they don't know their email addresses. Don't publish non-essential contact details on your website or any public directories . . . .

   c. **Carefully check emails:** "First off, your employees should be skeptical anytime they receive an email from an unknown sender. Second, most phishing emails are riddled with typos, odd syntax, or stilted language. Finally, check the 'From' address to see if it is odd . . . . If an email looks suspicious, employees should report it."

   d. **Beware of links and attachments:** "Do not click on links or download attachments without verifying the source first and establishing the legitimacy of the link or attachment. . . ."

---

[15] *The ProtonMail Guide to IT Security for Small Businesses*, PROTONMAIL (2019), available at https://protonmail.com/it-security-complete-guide-for-businesses.

e.  **Do not automatically download remote content:** "Remote content in emails, like photos, can run scripts on your computer that you are not expecting, and advanced hackers can hide malicious code in them. You should configure your email service provider to not automatically download remote content. This will allow you to verify an email is legitimate before you run any unknown scripts contained in it."

f.  **Hover over hyperlinks:** "Never click on hyperlinked text without hovering your cursor over the link first to check the destination URL, which should appear in the lower corner of your window. Sometimes the hacker might disguise a malicious link as a short URL." [Proofpoint notes that there are tools online available for retrieving original URLs from shortened ones.]

g.  **If in doubt, investigate:** "Often phishing emails will try to create a false sense of urgency by saying something requires your immediate action. However, if your employees are not sure if an email is genuine, they should not be afraid to take extra time to verify the email. This might include asking a colleague, your IT security lead, looking up the website of the service the email is purportedly from, or, if they have a phone number, calling the institution, colleague, or client that sent the email."

h.  **Take preventative measures:** "Using an end-to-end encrypted email service gives your business's emails an added layer of protection in the case of a data breach. A spam filter will remove the numerous random emails that you might receive, making it more difficult for a phishing attack to get through. Finally, other tools, like Domain-based Message Authentication, Reporting,

and Conformance (DMARC) help you be sure that the email came from the person it claims to come from, making it easier to identify potential phishing attacks."[16]

77.    As mentioned, these are basic, common-sense email security measures that ever business, not even healthcare businesses, should be doing. Solara, with its heightened standard of care should be doing even more. But by adequately taking these common sense solutions, Solara could have prevented this Data Breach from occurring.

**F.    A Data Breach like Solara's Results in Debilitating Losses to Consumers**

78.    Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[17]  Cyber criminals can leverage Plaintiffs' and Class members' Personal and Medical Information that was stolen in the Data Breach to commit thousands-indeed, millions-of additional crimes, including opening new financial accounts in Breach Victims' names, taking out loans in Breach Victims' names, using Breach Victims' names to obtain medical services and government benefits, using Breach Victims' Personal Information to file fraudulent tax returns, using Breach Victims' health insurance information to rack up massive medical debts in their names, using Breach Victims' health information to target them in other phishing and hacking intrusions based on their individual health needs, using Breach Victims' information to obtain government benefits, filing fraudulent tax returns using Breach Victims' information, obtaining driver's licenses in Breach Victims' names but with another person's photograph, and giving false information to police during an arrest. Even worse, Breach Victims could be arrested for crimes identity thieves have committed.

---

[16]*Id.*
[17]"Facts + Statistics: Identity Theft and Cybercrime," Insurance Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity").

79.    Personal and Medical Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the cyber black-market for years.

80.    This was a financially motivated data breach, as the only reason the cyber criminals stole Plaintiffs' and the Class members' Personal and Medical Information from Solara was to engage in the kinds of criminal activity described above in paragraph 78, which will result, and has already begun to, in devastating financial and personal losses to Breach Victims.

81.    This is not just speculative. As the FTC has reported, if hackers get access to Personal and Medical Information, they *will* use it.[18]

82.    Hackers may not use the information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information **may continue for years**. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[19]

83.    For instance, with a stolen social security number, which is part of the Personal and Medical Information compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[20] Identity thieves can also use the information stolen from

---

[18] Ari Lazarus, *How fast will identity thieves use stolen info?*, FED. TRADE COMM'N (May 24, 2017), https://www.consumer.ftc.gov/blog/2017/05/how-fast-will-identity-thieves-use-stolen-info.

[19] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.gao.gov/assets/270/262904.htmlu (emphasis added).

[20] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, Nov. 2, 2017, https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

Breach Victims to qualify for expensive medical care and leave them and their contracted health insurers on the hook for massive medical bills.

84.     Medical identity theft is one of the most common, most expensive, and most difficult to prevent forms of identity theft. According to Kaiser Health News, "medical-related identity theft accounted for 43 percent of all identity thefts reported in the United States in 2013," which is more "than identity thefts involving banking and finance, the government and the military, or education."[21]

85.     "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[22]

86.     As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI can go from $20 say up to—we've seen $60 or $70 [(referring to prices on dark web marketplaces)]."[23] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market.[24]

87.     If, moreover, the cyber criminals also manage to steal financial information, credit and debit cards, health insurance information, driver's licenses

---

[21] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/.

[22] *Id.*

[23] IDExperts, *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, https://www.idexpertscorp.com/knowedge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[24] *Managing cyber risks in an interconnected world*, PRICEWATERHOUSECOOPERS: Key findings from The Global State of Information Security Survey 2015, https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

and passports—as they did here—there is no limit to the amount of fraud that Solara has exposed the Breach Victims to.

88.    A study by Experian found that the average total cost of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[25]    Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third saw their insurance premiums rise, and forty percent were never able to resolve their identity theft at all.[26]

89.    As described above, identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit.[27]

90.    The danger of identity theft is compounded when a minor's Personal and Medical Information is compromised because minors typically have no credit reports to monitor. Thus, it can be difficult to monitor because a minor cannot simply place an alert on their credit report or "freeze" their credit report when no credit report exists.

91.    Defendant's offer of one year of identity monitoring to Plaintiffs and the Class is woefully inadequate. While some harm has begun already, the worst may be yet to come. There may be a time lag between when harm occurs versus when it is discovered, and also between when Personal and Medical Information is stolen and when it is used. Furthermore, identity monitoring only alerts someone to the fact that they have already been the victim of identity theft (*i.e.*, fraudulent acquisition and use of another person's Personal and Medical Information)—it does

---

[25] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

[26] *Id.*; *see also Healthcare Data Breach: What to Know About them and What to Do After One*, EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

[27] "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.

not prevent identity theft.[28] This is especially true for many kinds of medical identity theft, for which most credit monitoring plans provide little or no monitoring or protection.

92.    As a direct and proximate result of the Data Breach, Plaintiffs and the Class have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.  Plaintiffs and the Class must now take the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, healthcare providers, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and health insurance account information for unauthorized activity for years to come.

93.    Plaintiffs and the Class have suffered, and continue to suffer, actual harms for which they are entitled to compensation, including:

    a. Trespass, damage to, and theft of their personal property including Personal and Medical Information;

    b. Improper disclosure of their Personal and Medical Information;

    c. The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Personal and Medical Information being placed in the hands of criminals and having been already misused;

    d. The imminent and certainly impending risk of having their confidential medical information used against them by spam callers to defraud them;

    e. Damages flowing from Defendant untimely and inadequate notification of the data breach;

---

[28] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, Nov. 30, 2017, https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html.

f.  Loss of privacy suffered as a result of the Data Breach, including the harm of knowing cyber criminals have their Personal and Medical Information and that fraudsters have already used that information to initiate spam calls to members of the Class;

g.  Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the data breach;

h.  Ascertainable losses in the form of deprivation of the value of customers' personal information for which there is a well-established and quantifiable national and international market;

i.  The loss of use of and access to their credit, accounts, and/or funds;

j.  Damage to their credit due to fraudulent use of their Personal and Medical Information; and

k.  Increased cost of borrowing, insurance, deposits and other items which are adversely affected by a reduced credit score.

94.    Moreover, Plaintiffs and Class have an interest in ensuring that their information, which remains in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards.

95.    Defendant itself acknowledged the harm caused by the data breach because it offered Plaintiffs and Class members twelve months of identity theft repair and monitoring services. Twelve months of identity theft and repair and monitoring is woefully inadequate to protect Plaintiffs and Class members from a lifetime of identity theft risk and does nothing to reimburse Plaintiffs and Class members for the injuries they have already suffered.

**G.    Plaintiffs' Experiences**

96.    The risks and harms discussed above have already begun happening to Plaintiffs and other Breach Victims.

consolodatedcomplaint

97.    Plaintiffs' experiences are not unique from those of other Breach Victims, as their Personal and Medical Information was exposed in the same Data Breach to the same malicious actors.

**Plaintiff Juan Maldonado**

98.    Plaintiff Maldonado obtained medical supplies from Solara, to manage a health condition.

99.    Plaintiff Maldonado provided his Personal and Medical Information, as was required of him in order to obtain the medical supplies he received from Solara.

100.    On or about November 20, 2019, Plaintiff Maldonado received a letter from Solara, dated November 11, 2019, informing him that his "name, date of birth, medical information, and health insurance information" was compromised in the Data Breach. *See* **Exhibit 1** (*Letter from Martin Hoffman to Juan Maldonado*, dated Nov. 11, 2019).

101.    On Monday, December 2, 2019, Plaintiff Maldonado went to the hospital for urgent medical care. While checking in at the hospital and confirming his insurance and billing information, Plaintiff Maldonado learned that someone had changed his address associated with his insurance and billing information. His name and Social Security number were associated with a Post Office box address in Bloomfield, Illinois, an address that he never lived at and had never heard of before.

102.    As a direct result of the theft of his Personal and Medical Information from the Data Breach, Plaintiff Maldonado has experienced stress and anxiety, and has been caused to spend time investigating and attempting to correct these errors and to prevent fraud or identity theft.

103.    Because of the Data Breach, Plaintiff Maldonado's Personal and Medical Information is now in the hands of cyber criminals. Plaintiff Maldonado is

consolidatedcomplaint

now under imminent risk of identity theft and fraud, thanks to Defendant's negligence.

104.    Plaintiff Maldonado has not been the victim of any previous data breach to the best of his knowledge.

105.    Plaintiff Maldonado has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Maldonado's valuable Personal and Medical Information; (b) the imminent and certain impending injury flowing from fraud and identity theft post by Plaintiff Maldonado's Personal and Medical Information being placed in the hands of cyber criminals; (c) damages to and diminution in value of Plaintiff Maldonado's Personal and Medical Information that was entrusted to Defendant for the sole purpose of obtaining medical products and services necessary for Plaintiff Maldonado's health with the understanding that Defendant would safeguard this information against disclosure; (d) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff Maldonado should have received from Defendant when Defendant represented Plaintiff Maldonado's Personal and Medical Information would be protected by reasonable data security and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect Plaintiff Maldonado's Personal and Medical Information; and (e) continued risk to Plaintiff Maldonado's Personal and Medical Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Personal and Medical Information that was entrusted to Defendant.

**Plaintiff Bickford**

106.    Plaintiff Bickford received a letter from Solara, dated November 11, 2019, informing him that his "name, date of birth, and medical information" was present on a Solara employee Office 365 account that an "unknown actor" gained

consolodatedcomplaint

access to between April 2, 2019 and June 20, 2019, as a result of a phishing campaign. *See* **Exhibit 2** (*Letter from Martin Hoffman to Adam Bickford*, dated Nov. 11, 2019).

107.  Plaintiff Bickford has spent over three hours responding to the Data Breach so far, including reviewing his financial accounts, credit reports, and medical information for fraud. He also anticipates having to spend nearly the same amount of time each month indefinitely, as there is no easy way to monitor for or prevent medical identity theft.

108.  Since the fall of 2019, Plaintiff Bickford has noticed an increase in medical-related spam phone calls from persons apparently attempting to defraud him.

109.  Plaintiff Bickford must use the only supplier that is approved by his state-provided health insurance, and as such he has grave concern about the continued security of his Personal and Medical Information.

110.  Because the Data Breach was an intentional hack by cyber criminals seeking information of value that they could exploit, Plaintiff Bickford is at imminent risk of severe identity theft and exploitation.

111.  Plaintiff Bickford has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Bickford's valuable Personal and Medical Information; (b) the imminent and certain impending injury flowing from fraud and identity theft post by Plaintiff Bickford's Personal and Medical Information being placed in the hands of cyber criminals; (c) damages to and diminution in value of Plaintiff Bickford's Personal and Medical Information that was entrusted to Defendant for the sole purpose of obtaining medical products and services necessary for Plaintiff Bickford's health with the understanding that Defendant would safeguard this information against disclosure; (d) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff Bickford should have

consolodatedcomplaint

received from Defendant when Defendant represented Plaintiff Bickford's Personal and Medical Information would be protected by reasonable data security and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect Plaintiff Bickford's Personal and Medical Information; and (e) continued risk to Plaintiff Bickford's Personal and Medical Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Personal and Medical Information that was entrusted to Defendant.

**Plaintiff Harris**

112.   Plaintiff Harris has used Solara medical devices to manage his diabetes for years.

113.   To receive Defendant's medical devices, Plaintiff Harris was required to provide Defendant with his Personal and Medical Information.

114.   Plaintiff Harris received a letter from Solara, dated November 11, 2019, informing him that his "name, date of birth, Social Security number, medical information, billing / claims information, health insurance information, and Medicare ID / Medicaid ID" was compromised in the Data Breach. *See* **Exhibit 3** (*Letter from Martin Hoffman to Jeffrey Harris*, dated Nov. 11, 2019).

115.   Because of the Data Breach, Plaintiff Harris's Personal and Medical Information is now in the hands of cyber criminals. He, and all Breach Victims like him, are now imminently at risk of crippling identity theft and fraud.

116.   Plaintiff Harris has spent hours responding to this breach so far, including checking his credit reports and verifying his health information, and will continue to do so based on the difficulty of monitoring for and preventing medical identity theft.

117.   Since summer 2019, in the months following the Data Breach, Plaintiff Harris has received a noticeable increase in spam emails and phone calls from

persons attempting to sell him things. But this is not the ordinary spam modern Americans live with. These people know sensitive personal information about Plaintiff Harris and use it to attempt to defraud Harris.

118.    On one memorable occasion, a caller previously unknown to Plaintiff Harris mentioned to Plaintiff Harris facts about his medical history that are extremely sensitive and personal. Plaintiff Harris has carefully kept these facts from being publicly disclosed and has only provided them to healthcare providers and medical device suppliers—such as Defendant.

119.    This was very distressing to Plaintiff Harris. Having a stranger tell him his sensitive and personal medical information in an attempt to scam him out of his money was extremely distressing and caused him anxiety.

120.    The anxiety was made worse by this occurring before Plaintiff Harris received the notice letter (although after notice was required under the HIPAA Notification Rule).

121.    It is for this very reason that the federal and state governments, including Defendant's State of California, have made the protection of medical information such a priority.

122.    Plaintiff Harris has not been the victim of any previous data breach to the best of his knowledge.

123.    Solara is the sole contract provider for Plaintiff Harris's private health insurance and Medicare for the Southeast region. For this reason, Plaintiff Harris will need to continue using Solara.

124.    Plaintiff Harris has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Harris's valuable Personal and Medical Information; (b) the imminent and certain impending injury flowing from fraud and identity theft post by Plaintiff Harris's Personal and Medical Information being placed in the hands of cyber criminals; (c) damages to and diminution in value of Plaintiff Harris's Personal and Medical Information that was

CONSOLIDATED CLASS ACTION COMPLAINT

entrusted to Defendant for the sole purpose of obtaining medical products and services necessary for Plaintiff Harris's health with the understanding that Defendant would safeguard this information against disclosure; (d) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff Harris should have received from Defendant when Defendant represented Plaintiff Harris's Personal and Medical Information would be protected by reasonable data security and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect Plaintiff Harris's Personal and Medical Information; and (e) continued risk to Plaintiff Harris's Personal and Medical Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Personal and Medical Information that was entrusted to Defendant.

**Plaintiff Mercado**

125.   Plaintiff Mercado received a letter from Solara, dated November 11, 2019, informing him that his name, date of birth, medical information, billing / claims information, and health insurance information was compromised in the Data Breach. *See* **Exhibit 4** (*Letter from Martin Hoffman to Alex Mercadro*, dated Nov. 11, 2019).

126.   To receive the medical devices from Defendant, Plaintiff Mercado was required to provide Defendant with his Personal and Medical Information.

127.   Because of the Data Breach, Plaintiff Mercado's Personal and Medical Information is now in the hands of cyber criminals. He, and all Breach Victims like him, are now imminently at risk of crippling identity theft and fraud.

128.   Since the Breach period, Plaintiff Mercado has also experienced an increase in the number of spam emails and phone calls from unknown persons.

129.   This has been distressing to him and has caused him anxiety. He feels that any day his identity may be stolen and has spent time investigating and responding to the Data Breach.

130.   Because the Data Breach was an intentional hack by cyber criminals seeking information of value that they could exploit, Plaintiff Mercado is at imminent risk of identity theft and exploitation.

131.   Plaintiff Mercado has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Mercado's valuable Personal and Medical Information; (b) the imminent and certain impending injury flowing from fraud and identity theft post by Plaintiff Mercado's Personal and Medical Information being placed in the hands of cyber criminals; (c) damages to and diminution in value of Plaintiff Mercado's Personal and Medical Information that was entrusted to Defendant for the sole purpose of obtaining medical products and services necessary for Plaintiff Mercado's health with the understanding that Defendant would safeguard this information against disclosure; (d) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff Mercado should have received from Defendant when Defendant represented Plaintiff Mercado's Personal and Medical Information would be protected by reasonable data security and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect Plaintiff Mercado's Personal and Medical Information; and (e) continued risk to Plaintiff Mercado's Personal and Medical Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Personal and Medical Information that was entrusted to Defendant.

**Plaintiff Wardrop**

132.    Plaintiff Wardrop received a letter from Solara, dated November 11, 2019, informing him that his name, date of birth, medical information, billing and claims information, and health insurance information was compromised in the Data Breach. *See* **Exhibit 5** (*Letter from Martin Hoffman to Thomas Wardrop*, dated Nov. 11, 2019).

133.    To receive medical devices from Defendant, Plaintiff Wardrop was required to provide his Personal and Medical Information to Solara.

134.    Because of the Data Breach, Plaintiff Wardrop's Personal and Medical Information is now in the hands of cyber criminals. He, and all Breach Victims like him, are now imminently at risk of crippling identity theft and fraud.

135.    Since the Breach period, Plaintiff Wardrop has experienced unexplained credit inquiries and spam/phishing attempts that he believes are related to the Data Breach.

136.    This has been distressing to him and has caused him anxiety. He feels that any day his identity may be stolen and has spent time investigating and responding to the Data Breach.

137.    Because the Data Breach was an intentional hack by cyber criminals seeking information of value that they could exploit, Plaintiff Wardrop is at imminent risk of severe identity theft and exploitation.

138.    Plaintiff Wardrop has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Wardrop's valuable Personal and Medical Information; (b) the imminent and certain impending injury flowing from fraud and identity theft post by Plaintiff Wardrop's Personal and Medical Information being placed in the hands of cyber criminals; (c) damages to and diminution in value of Plaintiff Wardrop's Personal and Medical Information that was entrusted to Defendant for the sole purpose of obtaining medical products and services necessary for Plaintiff Wardrop's health with the understanding that

Defendant would safeguard this information against disclosure; (d) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff Wardrop should have received from Defendant when Defendant represented Plaintiff Wardrop's Personal and Medical Information would be protected by reasonable data security and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect Plaintiff Wardrop's Personal and Medical Information; and (e) continued risk to Plaintiff Wardrop's Personal and Medical Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Personal and Medical Information that was entrusted to Defendant.

**Plaintiff Keally for M.K.**

139.    Plaintiff Keally received a letter from Solara, dated November 11, 2019, informing her that her minor child M.K.'s name, date of birth, medical information, medical insurance information, and billing and claims information was compromised in the Data Breach. *See* **Exhibit 6** (*Letter from Martin Hoffman to "M.K." dated Nov. 11, 2019*).

140.    M.K. is a customer of Solara. To receive services and medical products from Solara, M.K. and Plaintiff Keally were required to provide Solara Personal and Medical Information.

141.    As a result of the Data Breach, Plaintiff Keally, on M.K.'s behalf, has expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the future consequences of the Data Breach for M.K. including investigating the information compromised and how best to ensure M.K. is protected from potential identity theft and medical information fraud, which efforts are continuous and ongoing.

142.  M.K. has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of M.K.'s valuable Personal and Medical Information; (b) the imminent and certain impending injury flowing from fraud and identity theft post by M.K.'s Personal and Medical Information being placed in the hands of cyber criminals; (c) damages to and diminution in value of M.K.'s Personal and Medical Information that was entrusted to Defendant for the sole purpose of obtaining medical products and services necessary for M.K.'s health with the understanding that Defendant would safeguard this information against disclosure; (d) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff Keally should have received from Defendant when Defendant represented M.K.'s Personal and Medical Information would be protected by reasonable data security and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect M.K.'s personal information; and (e) continued risk to M.K.'s Personal and Medical Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Personal and Medical Information that was entrusted to Defendant.

## V.    CHOICE OF LAW FOR NATIONWIDE CLAIMS

143.  The State of California has a significant interest in regulating the conduct of businesses operating within its borders. California seeks to protect the rights and interests of all California residents and citizens of the United States against a company headquartered and doing business in California. California has a greater interest in the nationwide claims of Plaintiffs and members of the Nationwide Class than any other state, and is most intimately concerned with the claims and outcome of this litigation.

144.  The corporate headquarters of Solara, located in Chula Vista, California, is the "nerve center" of its business activities – the place where its high-

level officers direct, control, and coordinate the company's activities, including its data security functions and major policy, financial, and legal decisions.

145.    Solara's response to the Data Breach at issue here, and corporate decisions surrounding such response, were made from and in California.

146.    Solara's breaches of duty to Plaintiffs and Nationwide Class members emanated from California.

147.    Application of California law to the Nationwide Class with respect to Plaintiffs' and Class members' claims is neither arbitrary nor fundamentally unfair because California has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiffs and the Nationwide Class.

148.    Under California's choice of law principles, which are applicable to this action, the common law of California applies to the nationwide common law claims of all Nationwide Class members. Additionally, given California's significant interest in regulating the conduct of businesses operating within its borders, California's Unfair Competition Law and Confidentiality of Medical Information Act may be applied to non-resident consumer plaintiffs as against this resident-defendant.

## VI.    CLASS ALLEGATIONS

149.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

150.    Plaintiffs bring all claims as class claims under Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs assert all claims on behalf of a nationwide Class, defined as follows:

**All persons in the United States and its Territories whose Personal and Medical Information was compromised by the Data Breach.**

151.    Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge,

justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

152.    Alternatively, Plaintiffs proposes the following alternative classes by state or groups of states, defined as follows:

**[Name of State] Subclass: All residents of [name of State] whose Personal and Medical Information was compromised by the Data Breach.**

153.    Also in the alternative, Plaintiffs request additional subclasses as necessary based on the types of Personal and Medical Information that were compromised.[29]

## A.    CLASS CERTIFICATION IS APPROPRIATE

154.    The proposed Nationwide Class or, alternatively, the separate Statewide Classes (collectively, the "Class" as used in this sub-section) meet the requirements of Fed. R. Civ. P. 23(a), (b)(1), (b)(2), (b)(3), and (c)(4).

155.    **Numerosity:** The proposed Class is so numerous that joinder of all members is impracticable. Defendant reported to the U.S. Department of Health & Human Services Office of Civil Rights that approximately 114,007 individuals were affected by the Data Breach[30] (the number was disclosed to the Indiana Attorney General's Office as 114,227).

156.    **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

a.    Whether Defendant failed to adequately safeguard Plaintiffs' and the Class' Personal and Medical Information;

---

[29]For ease of reference, the Class and state subclasses are collectively referred to herein as the "Class."

[30]Breach Portal, Cases Currently Under Investigation, U.S. DEPT. OF HEALTH & HUMAN SERVS., OFC. FOR CIV. RIGHTS (last visited Jan. 17, 2020), https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf.

consolodatedcomplaint

b.    Whether Defendant failed to protect Plaintiffs' and the Class' Personal and Medical Information;

c.    Whether Defendant's email and computer systems and data security practices used to protect Plaintiffs' and the Class' Personal and Medical Information violated the FTC Act, HIPAA, CMIA, and/or state laws and/or Defendant's other duties;

d.    Whether Defendant violated the data security statutes and data breach notification statutes applicable to Plaintiffs and the Class;

e.    Whether Defendant failed to notify Plaintiffs and members of the Class about the Data Breach expeditiously and without unreasonable delay after the Data Breach was discovered;

f.    Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard Breach Victims' Personal and Medical Information properly and as promised;

g.    Whether Defendant acted negligently in failing to safeguard Plaintiffs' and the Class' Personal and Medical Information;

h.    Whether Defendant entered into implied contracts with Plaintiffs and the members of the Class that included contract terms requiring Defendant to protect the confidentiality of Personal and Medical Information and have reasonable security measures;

i.    Whether Defendant violated the consumer protection statutes, data breach notification statutes, and state medical privacy statutes applicable to Plaintiffs and the Class;

j.    Whether Defendant failed to notify Plaintiffs and Breach Victims about the Data Breach as soon as practical and without delay after the Data Breach was discovered;

-36-

k.  Whether Defendant's conduct described herein constitutes a breach of their implied contracts with Plaintiffs and the Class;

l.  Whether Plaintiffs and the members of the Class are entitled to damages as a result of Defendant's wrongful conduct;

m.  What equitable relief is appropriate to redress Defendant's wrongful conduct; and

n.  What injunctive relief is appropriate to redress the imminent and currently ongoing harm faced by Plaintiffs and members of the Class.

157.  **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and the members of the Class sustained damages as a result of Defendant's uniform wrongful conduct.

158.  **Adequacy:** Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Class, and there are no defenses unique to Plaintiff. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Class.

159.  **Risks of Prosecuting Separate Actions:** This case is appropriate for certification because prosecution of separate actions would risk either inconsistent adjudications which would establish incompatible standards of conduct for the Defendant or would be dispositive of the interests of members of the proposed Class. Furthermore, Defendant is still in possession of Personal and Medical Information of Plaintiffs and the Class, and Defendant's systems are still vulnerable to attack—one standard of conduct is needed to ensure the future safety of Personal and Medical Information in Defendant's possession.

160.   **Policies Generally Applicable to the Class:** This case is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct towards members of the Class, and making final injunctive relief appropriate with respect to the proposed Class as a whole. Defendant's practices challenged herein apply to and affect the members of the Class uniformly, and Plaintiffs' challenge to those practices hinges on Defendant's conduct with respect to the proposed Class as a whole, not on individual facts or law applicable only to Plaintiffs.

161.   **Superiority:** This case is also appropriate for certification because class proceedings are superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and the members of the Class. The injuries suffered by each individual member of the Class are relatively small in comparison to the burden and expense of individual prosecution of the litigation necessitated by Defendant's conduct. Absent a class action, it would be virtually impossible for individual members of the Class to obtain effective relief from Defendant. Even if members of the Class could sustain individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties, including the Court, and would require duplicative consideration of the common legal and factual issues presented here. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court.

## VII.   CAUSES OF ACTION

### A.   COUNT I – NEGLIGENCE

162.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

163.   Defendant solicited, gathered, and stored the Personal and Medical Information of Plaintiffs and the Class.

164.    Defendant knew, or should have known, of the risks inherent in collecting and storing the Personal and Medical Information of Plaintiffs and the Class and the importance of adequate security.

165.    Defendant was well aware of the fact that hackers routinely attempted to access Personal and Medical Information without authorization. Defendant also knew about numerous, well-publicized data breaches wherein hackers stole the Personal and Medical Information from companies who held or stored such information.

166.    Solara owed a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and members of the Class when obtaining, storing, using, and managing personal information, including taking action to reasonably safeguard such data and providing notification to Plaintiff and the Class members of any breach in a timely manner so that appropriate action could be taken to minimize or avoid losses.

167.    This duty extends to protecting others from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures also have recognized the existence of a specific duty to reasonably safeguard personal information.

168.    Plaintiffs and the Class were the intended beneficiaries of Solara's duty to safeguard their Personal and Medical Information, creating a special relationship between them and Solara. Only Solara was in a position to ensure that its systems were sufficient to protect the Personal and Medical Information that Plaintiffs and the Class entrusted to it.

169.    In addition to the general duties above, Defendant's duties specifically included the following:

-39-

CONSOLIDATED CLASS ACTION COMPLAINT

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the Personal and Medical Information in its possession;

b. To protect the Personal and Medical Information in its possession using reasonable and adequate security procedures and systems;

c. To adequately and properly audit, test, and train its employees to avoid phishing emails;

d. To use adequate email security systems, including healthcare industry standard SPAM filters, DMARC enforcement, and/or Sender Policy Framework enforcement, to protect against phishing emails;

e. To adequately and properly audit, test, and train its employees regarding how to properly and securely transmit and store Personal and Medical Information;

f. To train its employees not to store Personal and Medical Information in their email inboxes longer than absolutely necessary for the specific purpose that it was sent or received;

g. To implement processes to quickly detect a data breach, security incident, or intrusion; and

h. To promptly notify Plaintiffs and Class members of any data breach, security incident, or intrusion that affected or may have affected their Personal and Medical Information.

170. It was foreseeable that injury to Plaintiffs and the Class would result from Solara's violation of these duties in mishandling the Personal and Medical Information of Plaintiffs and the Class.

171. Because Defendant knew that a security incident, breach or intrusion upon its systems would potentially damage thousands of its current and/or former patients, including Plaintiffs and Class members, it had a duty to adequately protect their Personal and Medical Information.

consolidatedcomplaint

172.   Defendant knew, or should have known, that its security practices and computer systems did not adequately safeguard the Personal and Medical Information of Plaintiffs and the Class.

173.   Defendant breached its duties of care by failing to provide fair, reasonable, or adequate computer systems and security practices to safeguard the Personal and Medical Information of Plaintiffs and the Class.

174.   Defendant breached their duties of care by failing to provide prompt notice of the Data Breach to the persons whose personal information was compromised.

175.   Defendant acted with reckless disregard for the security of the Personal and Medical Information of Plaintiffs and the Class because Defendant knew or should have known that their computer systems and data security practices were not adequate to safeguard the Personal and Medical Information that it collected and stored, which hackers were attempting to access.

176.   Defendant acted with reckless disregard for the rights of Plaintiffs and the Class by failing to provide prompt and adequate notice of the data breach so that they could take measures to protect themselves from damages caused by the fraudulent use of Personal and Medical Information compromised in the Data Breach.

177.   Defendant had a special relationship with Plaintiffs and the Class. Plaintiffs' and the Class' willingness to entrust Defendant with their personal information was predicated on the understanding that Defendant would take adequate security precautions. Moreover, only Defendant had the ability to protect its systems (and the Personal and Medical Information stored on them) and to implement security practices to protect the Personal and Medical Information that it collected and stored from attack.

consolidatedcomplaint

178.   Defendant's own conduct also created a foreseeable risk of harm to Plaintiffs and Class members and their Personal and Medical Information. Defendant's misconduct included failing to:

a. Secure its employees' email accounts;

b. Secure access to its servers;

c. Comply with current industry standard security practices;

d. Encrypt Personal and Medical Information during transit and while stored on Defendant's systems;

e. Properly and adequately train their employees on proper data security practices;

f. Implement adequate system and event monitoring;

g. Implement the systems, policies, and procedures necessary to prevent hackers from accessing and utilizing Personal and Medical Information transmitted and/or stored by Defendant;

h. Undertake periodic audits of record-keeping processes to evaluate the safeguarding of Personal and Medical Information;

i. Develop a written records retention policy that identifies what information must be kept in company email accounts and for how long;

j. Destroy all discarded employee information, including information on prospective employees, temporary workers, subcontractor, and former employees;

k. Secure Personal and Medical Information and limit access to it to those with a legitimate business need;

l. Employ or contract with trained professionals to ensure security of network servers and evaluate the systems used to manage e-mail, Internet use, and so forth;

m. Avoid using Social Security numbers as a form of identification; and

n. Have a plan ready and in position to act quickly should a theft or data breach occur.

179. Defendant also had independent duties under federal and state law requiring it to reasonably safeguard Plaintiffs' and the Class' Personal and Medical Information and promptly notify them about the Data Breach.

180. Defendant breached the duties it owed to Plaintiffs and Class members in numerous ways, including:

a. By creating a foreseeable risk of harm through the misconduct previously described;

b. By failing to implement adequate security systems, protocols and practices sufficient to protect their Personal and Medical Information both before and after learning of the Data Breach;

c. By failing to comply with the minimum industry data security standards before, during, and after the period of the Data Breach; and

d. By failing to timely and accurately disclose that the Personal and Medical Information of Plaintiffs and the Class had been improperly acquired or accessed in the Data Breach.

181. But for Defendant's wrongful and grossly negligent breach of the duties it owed Plaintiffs and the Class members, their Personal and Medical Information either would not have been compromised or they would have been able to prevent some or all of their damages.

182. As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and the Class have suffered damages and are at imminent risk of certainly impending future harm.

183. The injury and harm that Plaintiffs and Class members suffered (as alleged above) was and is reasonably foreseeable.

184.   The injury and harm that Plaintiffs and Class members suffered (as alleged above) was the direct and proximate result of Defendant's negligent conduct.

185.   Plaintiffs and the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

### B.    COUNT II – NEGLIGENCE *PER SE*

186.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

187.   Pursuant to the FTC Act, 15 U.S.C. § 45(a), Defendant had a duty to provide fair and adequate computer systems and data security to safeguard the Personal and Medical Information of Plaintiffs and the Class.

188.   Defendant is an entity covered by the HIPAA, 45 C.F.R. §160.102, and as such is required to comply with the HIPAA's Privacy Rule and Security Rule. HIPAA requires Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). HIPAA also requires Defendant to obtain satisfactory assurances that its business associates would appropriately safeguard the protected health information it receives or creates on behalf of the Defendant. 45 C.F.R. §§ 164.502(e), 164.504(e), 164.532(d) and (e). The confidential data at issue in this case constitutes "protected health information" within the meaning of HIPAA.

189.   HIPAA further requires Defendant to disclose the unauthorized access and theft of the protected health information of Plaintiffs and the Class "without unreasonable delay" so that Plaintiffs and Class members could take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their personal information. *See* 45 C.F.R. §§ 164.404, 164.406, and 164.410.

190.   Pursuant to the CMIA, Michigan Identity Theft Protection Act, and other states' medical and personal information privacy laws, Defendant had additional duties to implement safeguards to protect Plaintiffs' and the Class's Personal and Medical Information.

191.   The FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Solara, of failing to use reasonable measures to protect Personal and Medical Information. The FTC publications and orders described above also formed part of the basis of Defendant's duty in this regard.

192.   Defendant solicited, gathered, and stored the Personal and Medical Information of Plaintiffs and the Class as part of its business of selling medical supplies and pharmaceuticals, which affects commerce.

193.   Defendant violated the FTC Act by failing to use reasonable measures to protect the Personal and Medical Information of Plaintiffs and the Class and not complying with applicable industry standards, as described herein.

194.   Defendant breached its duties to Plaintiffs and the Class under the FTC Act, HIPAA, CMIA, and other state data security and medical privacy statutes by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Breach Victim's Personal and Medical Information, and by failing to provide prompt notice without reasonable delay.

195.   Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

196.   Plaintiffs and the Class are within the class of persons that HIPAA, CMIA, and the FTC Act were intended to protect.

197.   The harm that occurred as a result of the Data Breach is the type of harm the FTC Act, HIPAA, CMIA, and the state data breach and medical privacy statutes were intended to guard against.

198.   Defendant breached its duties to Plaintiffs and the Class under these laws by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and the Class' Personal and Medical Information.

199.   Additionally, Defendant had a duty to promptly notify Breach Victims of the Data Breach. For instance, HIPAA required Defendant to notify Breach Victims within 60 days of the discovery of the Data Breach. On the state level, California law requires that notice of a "breach of the security of the system . . . shall be made in the most expedient time possible and without unreasonable delay," Cal. Civ. Code § 1798.82, Connecticut provides that notice of a breach "shall be made without unreasonable delay but not later than ninety days after the discovery of such breach, unless a shorter time is required under federal law," Conn. Stat. § 36a-701b(b)(1), and North Carolina and Michigan requires notice "without unreasonable delay," N.C. Gen. Stat. § 75-65(a); Mich. Comp. Laws Ann. § 445.72(4).

200.   Defendant did not notify Breach Victims of the Data Breach until around November 11, 2019.

201.   Defendant knew on or before June 28, 2019, that unauthorized persons had accessed and/or viewed or were reasonably likely to have accessed and/or viewed private, protected, personal information of Plaintiffs and the Class.

202.   Defendant breached its duties to Plaintiffs and the Class by unreasonably delaying and failing to provide notice expeditiously and/or as soon as practicable to Plaintiffs and the Class of the Data Breach.

203.   Defendant's violation of the FTC Act, HIPAA, CMIA, CCRA, state data security statutes, and/or the state data breach notification statutes constitute negligence *per se*.

consolidatedcomplaint

204.  As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, damages arising from the Data Breach, as alleged above.

205.  The injury and harm that Plaintiffs and Class members suffered (as alleged above) was the direct and proximate result of Defendant's negligence *per se*.

### C.    COUNT III – BREACH OF CONTRACT

206.  Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

207.  As a direct-to-consumer pharmacy and medical device company, Defendant entered into contracts with Plaintiffs and Class members.

208.  The promises and representations described above relating to compliance with HIPAA, CMIA, and industry practices, and about Solara's alleged concern for its patients privacy rights became terms of the contract between it and its customers, including Breach Victims.

209.  Defendant breached these promises by failing to comply with HIPAA, CMIA, and reasonable industry practices.

210.  As a result of Defendant's breach of these terms, Breach Victims have been seriously harmed and put at grave risk of debilitating future harms.

211.  Plaintiffs and Class members are therefore entitled to damages, including restitution and unjust enrichment, declaratory and injunctive relief, and attorney fees, costs, and expenses.

### D.    COUNT IV – BREACH OF IMPLIED CONTRACT
    (Alternatively to Count III)

212.  Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

213.  When Plaintiffs and the Class members provided their Personal and Medical Information to Defendant when seeking to purchase medical devices or

seeking employment, they entered into implied contracts in which Defendant agreed to comply with its statutory and common law duties to protect their Personal and Medical Information and to timely notify them in the event of a data breach.

214.    Defendant required its patients and employees to provide Personal and Medical Information in order to purchase medical devises or to apply for a job with Defendant.

215.    Defendant affirmatively represented that it collected and stored the Personal and Medical Information of Plaintiffs and the members of the Class in compliance with HIPAA, the CMIA, and other statutory and common law duties, and using reasonable, industry standard means.

216.    Based on the implicit understanding and also on Defendant's representations (as described above), Plaintiffs and the Class accepted Defendant's offers and provided Defendant with their Personal and Medical Information.

217.    Plaintiffs and Class members would not have provided their Personal and Medical Information to Defendant had they known that Defendant would not safeguard their Personal and Medical Information as promised or provide timely notice of a data breach.

218.    Plaintiffs and Class members fully performed their obligations under the implied contracts with Defendant.

219.    Defendant breached the implied contracts by failing to safeguard Plaintiffs' and Class members' personal information and failing to provide them with timely and accurate notice of the Data Breach.

220.    The losses and damages Plaintiffs and Class members sustained (as described above) were the direct and proximate result of Defendant's breach of the implied contract with Plaintiffs and Class members.

E.    **COUNT V – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

221.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

222.   As described above, Solara made promises and representations to Plaintiffs and the Class that it would comply with HIPAA and other applicable laws and industry best practices.

223.   These promises and representations became a part of the contract between Solara and Breach Victims.

224.   While Solara had discretion in the specifics of how it met the applicable laws and industry standards, this discretion was governed by an implied covenant of good faith and fair dealing.

225.   Defendant breached this implied covenant when it engaged in acts and/or omissions that are declared unfair trade practices by the FTC and state statutes and regulations (including California's UCL), and when it engaged in unlawful practices under HIPAA, the CMIA, and other state personal and medical privacy laws. These acts and omissions included: representing that it would maintain adequate data privacy and security practices and procedures to safeguard the Personal and Medical Information from unauthorized disclosures, releases, data breaches, and theft; omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections for the Class's Personal and Medical Information; and failing to disclose to the Class at the time they provided their Personal and Medical Information to it that Solara's data security systems, including training, auditing, and testing of employees, failed to meet applicable legal and industry standards.

226.   Plaintiffs and Class members did all or substantially all of the significant things that the contract required them to do.

227.   Likewise, all conditions required for Defendant's performance were met.

228.   Defendant's acts and omissions unfairly interfered with Class Members' rights to receive the full benefit of their contracts.

229.    Plaintiffs and Class Members have been harmed by Defendant's breach of this implied covenant in the many ways described above, including overpayment for products and services, actual identity theft and/or imminent risk of certainly impending and devastating identity theft that exists now that cyber criminals have their Personal and Medical Information, and the attendant long-term expense of attempting to mitigate and insure against these risks.

230.    Solara is liable for this breach of these implied covenants whether or not it is found to have breached any specific express contractual term.

231.    Plaintiffs and Class members are entitled to damages, including compensatory damages and restitution, declaratory and injunctive relief, and attorney fees, costs, and expenses.

## F.    COUNT VI – UNJUST ENRICHMENT

232.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

233.    Plaintiffs and Class Members conferred a monetary benefit on Defendant. Defendant received and retained money belonging to Plaintiffs and Class Members either directly through copayments and coinsurance or indirectly through health insurance/medical plans that they had paid for.

234.    Defendant had knowledge of the benefits conferred on it by Plaintiffs and the Class Members.

235.    The money that Plaintiffs and Class members paid indirectly to Defendant was supposed to be used by Defendant, in part, to pay for the costs of HIPAA and CMIA compliance and reasonable data privacy and security practices and procedures.

236.    As a result of Defendant's conduct, Plaintiffs and Class members suffered damages in an amount equal to the difference in value between health care services with the reasonable data privacy and security practices and procedures that

they paid for, and the inadequate health care services without reasonable data privacy and security practices and procedures that they received.

237.   Under principals of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class members because Defendant failed to implement (or to adequately implement) the data privacy and security practices and procedures that Plaintiffs and Class members paid for and that were otherwise mandated by HIPAA regulations, federal, state, and local laws, and industry standards.

238.   Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds that Defendant received.

239.   A constructive trust should be imposed on all unlawful or inequitable sums received by Defendant traceable to Plaintiffs and Class Members.

**G.   COUNT VII – CALIFORNIA UNFAIR COMPETITION LAW, Cal. Bus. & Prof. Code §17200, *et seq.***
**(On Behalf of the Class or alternatively a California Subclass)**

240.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

241.   Defendant is both organized under the laws of California and headquartered in California. Defendant violated California's Unfair Competition Law ("UCL"), Cal. Bus. Prof. Code § 17200, *et seq.*, by engaging in unlawful, unfair or fraudulent business acts and practices and unfair, deceptive, untrue or misleading advertising that constitute acts of "unfair competition" as defined in the UCL, including, but not limited to, the following:

a.   by representing and advertising that they would maintain adequate data privacy and security practices and procedures to safeguard their Personal and Medical Information from unauthorized disclosure, release, data breach, and theft; representing and advertising that they did and would comply with

the requirement of relevant federal and state laws pertaining to the privacy and security of the Class' Personal and Medical Information; and omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections for the Class' Personal and Medical Information;

b.  by soliciting and collecting Class members' Personal and Medical Information with knowledge that the information would not be adequately protected; and by storing Plaintiffs' and Class members' Personal and Medical Information in an unsecure electronic environment;

c.  by failing to disclose the Data Breach in a timely and accurate manner, in violation of Cal. Civ. Code §1798.82;

d.  by violating the privacy and security requirements of HIPAA, 42 U.S.C. §1302d, *et seq.*;

e.  by violating the CMIA, Cal. Civ. Code § 56, *et seq.*; and

f.  by violating the CCRA, Cal. Civ. Code § 1798.82.

242.  These unfair acts and practices were immortal, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Class members. Defendant's practice was also contrary to legislatively declared and public policies that seek to protect consumer data and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws like the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1302d, *et seq.*, CMIA, Cal. Civ. Code § 56, *et seq.*, and the CCRA, Cal. Civ. Code § 1798.81.5.

243.  As a direct and proximate result of Defendant's unfair and unlawful practices and acts, Plaintiffs and the Class were injured and lost money or property, including but not limited to the overpayments Defendant received to take reasonable and adequate security measures (but did not), the loss of their legally protected

interest in the confidentiality and privacy of their Personal and Medical Information, and additional losses described above.

244.    Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard Plaintiffs' and Class members' Personal and Medical Information and that the risk of a data breach or theft was highly likely. Defendant's actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of the Class.

245.    The conduct and practices described above emanated from California where decisions related to Solara's advertising and data security were made.

246.    Plaintiffs seeks relief under the UCL, including restitution to the Class of money or property that the Defendant may have acquired by means of Defendant's deceptive, unlawful, and unfair business practices, declaratory relief, attorney fees, costs and expenses (pursuant to Cal. Code Civ. P. § 1021.5), and injunctive or other equitable relief.

**H.    COUNT VIII – CALIFORNIA CONSUMER RECORDS ACT, Cal. Civ. Code § 1798.82, *et seq.* (On Behalf of Plaintiff Mercado and an alternative California Class)**

247.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

248.    Section 1798.2 of the California Civil Code requires any "person or business that conducts business in California, and that owns or licenses computerized data that includes personal information" to "disclose any breach of the security of the system following discovery or notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Under section 1798.82, the disclosure "shall be made in the most expedient time possible and without unreasonable delay . . . ."

-53-

249.   The CCRA further provides: "Any person or business that maintains computerized data that includes personal information that the person or business does not own shall notify the owner or licensee of the information of any breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82(b).

250.   Any person or business that is required to issue a security breach notification under the CCRA shall meet all of the following requirements:

    a.   The security breach notification shall be written in plain language;

    b.   The security breach notification shall include, at a minimum, the following information:

        i.   The name and contact information of the reporting person or business subject to this section;

        ii.   A list of the types of personal information that were or are reasonably believed to have been the subject of a breach;

        iii.   If the information is possible to determine at the time the notice is provided, then any of the following:

            1.   The date of the breach;

            2.   The estimated date of the breach; or

            3.   The date range within which the breach occurred. The notification shall also include the date of the notice.

        iv.   Whether notification was delayed as a result of a law enforcement investigation, if that information is possible to determine at the time the notice is provided;

        v.   A general description of the breach incident, if that information is possible to determine at the time the notice is provided; and

        vi.   The toll-free telephone numbers and addresses of the major credit reporting agencies if the breach exposed a Social Security

number or a driver's license or California identification card number.

251.   The Data Breach described herein constituted a "breach of the security system" of Defendant.

252.   As alleged above, Defendant unreasonably delayed informing Plaintiffs and Class members about the Data Breach, affecting their Personal and Medical Information, after Defendant knew the Data Breach had occurred.

253.   Defendant failed to disclose to Plaintiffs and the Class, without unreasonable delay and in the most expedient time possible, the breach of security of their unencrypted, or not properly and securely encrypted, Personal and Medical Information when Defendant knew or reasonably believed such information had been compromised.

254.   Defendant's ongoing business interests gave Defendant incentive to conceal the Data Breach from the public to ensure continued revenue.

255.   Upon information and belief, no law enforcement agency instructed Defendant that timely notification to Plaintiffs and the Class would impede its investigation.

256.   As a result of Defendant's violation of Cal. Civ. Code § 1798.82, Plaintiffs and the Class were deprived of prompt notice of the Data Breach and were thus prevented from taking appropriate protective measures, such as securing identity theft protection or requesting a credit freeze. These measures could have prevented some of the damages suffered by Plaintiffs and Class members because their stolen information would have had less value to identity thieves.

257.   As a result of Defendant's violation of Cal. Civ. Code § 1798.82, Plaintiffs and the Class suffered incrementally increased damages separate and distinct from those simply caused by the Data Breach itself.

258.    Plaintiffs and the Class seek all remedies available under Cal. Civ. Code § 1798.84, including, but not limited to the damages suffered by Plaintiffs and the other Class members as alleged above and equitable relief.

259.    Defendant's misconduct as alleged herein is fraud under Cal. Civ. Code § 3294(c)(3) in that it was deceit or concealment of a material fact known to the Defendant conducted with the intent on the part of Defendant of depriving Plaintiffs and the Class of "legal rights or otherwise causing injury." In addition, Defendant's misconduct as alleged herein is malice or oppression under Cal. Civ. Code § 3294(c)(1) and (c) in that it was despicable conduct carried on by Defendant with a willful and conscious disregard of the rights or safety of Plaintiffs and the Class and despicable conduct that has subjected Plaintiffs and the Class to crewel and unjust hardship in conscious disregard of their rights. As a result, Plaintiffs and the Class are entitled to punitive damages against Defendant under Cal. Civ. Code § 3294(a).

I.    **COUNT IX – CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT, Cal. Civ. Code § 56, *et seq.***

260.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

261.    Defendant is a "contractor," as defined in Cal. Civ. Code § 56.05(d), a "pharmaceutical company," as defined in *id.* § 56.05(1), and "a provider of health care," as defined in Cal. Civ. Code § 56.06, and is therefore subject to the requirements of the CMIA, Cal. Civ. Code §§ 56.10(a), (d) and (e), 56.36(b), 56.101(a) and (b).

262.    Defendant is a person licensed under California under California's Business and Professions Code, Division 2. *See* Cal. Bus. Prof. Code § 4000, *et seq.* Solara therefore qualifies as a "provider of health care," under the CMIA.

263.    Plaintiffs and the Class are "patients," as defined in CMIA, Cal. Civ. Code § 56.05(k) ("'Patient' means any natural person, whether or not still living,

who received health care services from a provider of health care and to whom medical information pertains.").

264.   Defendant disclosed "medical information," as defined in CMIA, Cal. Civ. Code § 56.05(j), to unauthorized persons without first obtaining consent, in violation of Cal. Civ. Code § 56.10(a). The disclosure of information to unauthorized individuals in the Data Breach resulted from the affirmative actions of Solara's employees, which allowed the hackers to see and obtain Plaintiffs' and the Class members' medical information.

265.   Defendant's negligence resulted in the release of individually-identifiable medical information pertaining to Plaintiffs and the Class to unauthorized persons and the breach of the confidentiality of that information. Defendant's negligent failure to maintain, preserve, store, abandon, destroy, and/or dispose of Plaintiffs' and Class members' medical information in a manner that preserved the confidentiality of the information contained therein, in violation of Cal. Civ. Code §§ 56.06 and 56.101(a).

266.   Defendant's computer systems did not protect and preserve the integrity of electronic medical information in violation of Cal. Civ. Code § 56.101(b)(1)(A).

267.   Plaintiffs and the Class were injured and have suffered damages, as described above, from Defendant's illegal disclosure and negligent release of their medical information in violation of Cal. Civ. Code §§ 56.10 and 56.101, and therefore seek relief under Civ. Code §§ 56.35 and 56.36, including actual damages, nominal statutory damages of $1,000, punitive damages of $3,000, injunctive relief, and attorney fees, expenses and costs.

**J.     COUNT X – PENNSYLVANIA UNFAIR TRADE PRACTICES, 73 Pa. Stat. Ann. § 201-1, *et seq.* (on Behalf of Plaintiffs Maldonado and Keally ex rel. M.K. and an Alternative Pennsylvania Class)**

268.   Plaintiffs incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

-57-

269.   Plaintiffs Maldonado and Keally, on behalf of M.K. (collectively, the "Pennsylvania Plaintiffs"), bring this claim against Defendant on behalf of an alternative Pennsylvania Class.

270.   The Pennsylvania Plaintiffs, the alternative Pennsylvania Class, and Defendant are "persons" within the meaning of 73 Pa. Cons. Stat. Ann. §201-2(2).

271.   The Pennsylvania Plaintiffs and the alternative Pennsylvania Class purchased Defendant's products and services for personal, family, or household purposes within the meaning of 73 Pa. Cons. Stat. Ann. §201-9.2.

272.   The Pennsylvania Plaintiffs and the alternative Pennsylvania Class directly or indirectly purchased medical supplies from Defendant in the course of trade or commerce within the meaning of 73 Pa. Stat. Ann. §201-2(3)

273.   Defendant engaged in unlawful, unfair, and deceptive acts and practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the services purchased by the Pennsylvania Plaintiffs and the alternative Pennsylvania Class in violation of 73 Pa. Stat. Ann. §201-2, including but not limited to the following:

    a. Defendant misrepresented material facts pertaining to the sale of medical supplies to the alternative Pennsylvania Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard the Personal and Medical Information of the alternative Pennsylvania Class from unauthorized disclosure, release, data breach, and theft in violation of 73 Pa. Stat. Ann. § 201-2(4)(v), (ix), and (xxi);

    b. Defendant misrepresented material facts pertaining to the sale of medical supplies to the alternative Pennsylvania Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and

security of the alternative Pennsylvania Class's Personal and Medical Information in violation of 73 Pa. Stat. Ann. § 201-2(4)(v), (ix), and (xxi);

c.  Defendant omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for the alternative Class's Personal and Medical Information in violation of in violation of 73 Pa. Stat. Ann. § 201-2(4)(v), (ix), and (xxi);

d.  Defendant engaged in unfair, unlawful, and deceptive acts and practices with respect to the sale of medical supplies by failing to maintain the privacy and security of the alternative Class's Personal and Medical Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Data Breach. These unfair, unlawful, and deceptive acts and practices violated duties imposed by laws including the FTC Act, 15 U.S.C. § 45 and HIPAA, 42 U.S.C. § 1302d, *et seq.*;

e.  Defendant engaged in unlawful, unfair, and deceptive acts and practices with respect to the sale of medical supplies by failing to disclose the Data Breach to the alternative Class in a timely and accurate manner, in violation of 73 Pa. Stat. § 2303(a); and

f.  Defendant engaged in unlawful, unfair, and deceptive acts and practices with respect to the sale of medical supplies by failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect the alternative Class's Personal and Medical Information from further unauthorized disclosure, release, data breach, and theft.

274.  The above unlawful, unfair, and deceptive acts and practices by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably

avoid; this substantial injury outweighed any benefits to consumers or to competition.

275.   Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the alternative Class' Personal and Medical Information and that risk of a data breach or theft was highly likely. Defendant's actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the alternative Class.

276.   Defendant intended for the Pennsylvania Plaintiffs and the alternative Pennsylvania Class to rely on, and they did rely on, Defendant's misrepresentations and omissions of material fact as alleged herein.

277.   As a direct and proximate result of Defendant's deceptive acts and practices, the alternative Class members suffered an ascertainable loss of money or property and actual damages, as described above, including the loss of their legally protected interest in the confidentiality and privacy of their Personal and Medical Information.

278.   The Pennsylvania Plaintiffs and the alternative Pennsylvania Class seek relief under 73 Pa. Cons. Stat. §201-9.2, including injunctive relief, actual damages, $100 statutory damages per Class member, and/or treble damages, whichever is greater, along with reasonable attorney fees and costs.

**K.   COUNT XI - CONNECTICUT UNFAIR TRADE PRACTICES, Conn. Gen. Stat. Ann. § 42-110b, *et seq.* (on Behalf of Plaintiff Bickford and an Alternative Connecticut Class)**

279.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

280.   Plaintiff Bickford brings this claim against Defendant on behalf of an alternative Connecticut Subclass.

281.    Plaintiff Bickford and the alternative subclass directly or indirectly purchased medical supplies from Defendant in "trade" and "commerce" as defined in Conn. Gen. Stat. § 42-110b(a) for personal use.

282.    Connecticut's Unfair Trade Practices Act (hereinafter in this section, "CUTPA") provides that: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

283.    CUTPA provides that: "Any person who suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages." Conn. Gen. Stat. § 42-110g(a).

284.    Unfair or deceptive acts or practices are those defined in CUTPA or by other Connecticut statutes, and are guided by the interpretation of the FTC Act.

285.    The Connecticut data breach notification act, Conn. Gen. Stat. §36a-701b, *et seq.*, provides that failure to comply with the notice timelines constitutes an unfair and deceptive practice under CUTPA.

286.    Notice must be given "without unreasonable delay" but not later than 90 days after the discovery of such breach, "unless a shorter time is required under federal law." Conn. Gen. Stat. § 36a-701b(b)(1).

287.    Here, a shorter time *is* required under HIPAA, as it requires individual notice within 60 days of the discovery of a breach.

288.    Defendant failed to provide notice within that time period. In fact, it took Defendant more than twice that time period for it to start mailing individual notices.

289.    This delay deprived Plaintiff Bickford and all Breach Victims in Connecticut of the information they needed to protect themselves during that period. It is established public policy under Connecticut and Federal law that ignorance is

not bliss when your Personal and Medical Information is in the hands of cyber criminals.

290.   This failure by Defendant constituted an unfair trade practice. Conn. Gen. Stat. § 36a-706b(g).

291.   Additionally, CUTPA provides that in its interpretation and application, the courts "shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 USC 45(a)(1)), as from time to time amended." Conn. Gen. Stat. § 42-110b(b).

292.   As noted above, the FTC has interpreted "unfair practice" in the FTC Act, 15 U.S.C. § 15(a), to include a business's failure to adequately protect its customers personal data. *See, e.g.*, *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 245-47 (3d Cir. 2015); *In re BJ's Wholesale Club, Inc.*, 140 F.T.C. 465 (2005).

293.   Defendant engaged in unlawful, unfair, and deceptive acts and practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the services purchased by Plaintiff Bickford and the alternative Connecticut Class in violation of Conn. Gen. Stat. Ann. §42-110b, including but not limited to the following:

     a.  Defendant misrepresented material facts pertaining to the sale of medical supplies to the alternative subclass by representing that they would maintain adequate data privacy and security practices and procedures to safeguard the Personal and Medical Information of the alternative subclass from unauthorized disclosure, release, data breach, and theft;

     b.  Defendant misrepresented material facts pertaining to the sale of medical supplies to the alternative subclass by representing that they did and would comply with the requirements of relevant

federal and state laws pertaining to the privacy and security of the alternative subclass's Personal and Medical Information;

c.   Defendant omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for the alternative Connecticut Class' Personal and Medical Information.

d.   Defendant engaged in unfair, unlawful, and deceptive acts and practices with respect to the sale of medical supplies by failing to maintain the privacy and security of the alternative Connecticut Class' Personal and Medical Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Data Breach. These unfair, unlawful, and deceptive acts and practices violated duties imposed by laws including the FTC Act, 15 U.S.C. § 45 and HIPAA, 42 U.S.C. § 1302d, *et seq.*;

e.   Defendant engaged in unlawful, unfair, and deceptive acts and practices with respect to the sale of medical supplies by failing to disclose the Data Breach to the alternative Connecticut Class in a timely and accurate manner; and

f.   Defendant engaged in unlawful, unfair, and deceptive acts and practices with respect to the sale of medical supplies by failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect the alternative Connecticut Class' Personal and Medical Information from further unauthorized disclosure, release, data breach, and theft.

294.   The above unlawful, unfair, and deceptive acts and practices by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably

consolidatedcomplaint

avoid; this substantial injury outweighed any benefits to consumers or to competition.

295.    Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the alternative Connecticut Class' Personal and Medical Information and that risk of a data breach or theft was highly likely. Defendant's actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the alternative subclass.

296.    As a direct and proximate result of Defendant's deceptive acts and practices, the alternative Connecticut Class members suffered an ascertainable loss, as described above, including the loss of their legally protected interest in the confidentiality and privacy of their Personal and Medical Information.

297.    Plaintiff Bickford and the alternative Connecticut Class seek relief under Conn. Gen. Stat. § 42-110g, including actual damages, punitive damages, injunctive relief, and attorney fees, expenses, and costs.

**L.    COUNT XII – MICHIGAN CONSUMER PROTECTION ACT, Mich. Comp. Laws Ann. § 445.903, *et seq.* (on Behalf of Plaintiff Wardrop and an Alternative Michigan Class)**

298.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

299.    This Count is brought on behalf of Plaintiff Wardrop and an alternative Michigan Class.

300.    Defendant and Michigan Class members are "persons" as defined by Mich. Comp. Laws Ann. § 445.902(d).

301.    Defendant advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws Ann. § 445.903(g).

302.    Defendant engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Mich. Comp. Laws Ann. § 445.903(1), including:

a.    Representing that their goods and services have characteristics, uses, and benefits that they do not have, in violation of Mich. Comp. Laws Ann. § 445.903(1)(c);

b.    Representing that their goods and services are of a particular standard or quality if they are of another in violation of Mich. Comp. Laws Ann. § 445.903(1)(e);

c.    Defendant advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws Ann. § 445.903(g);

d.    Making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, in violation of Mich. Comp. Laws Ann. § 445.903(1)(bb); and

e.    Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive matter, in violation of Mich. Comp. Laws Ann. § 445.903(1)(cc).

303.    Defendant's unfair, unconscionable, and deceptive practices include:

a.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Wardrop's and Michigan Class members' Personal and Medical Information, which was a direct and proximate cause of the Data Breach;

b.    Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security

and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Wardrop's and Michigan Class members' Personal and Medical Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, CMIA, and HIPAA, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff Wardrop's and Michigan Class members' Personal and Medical Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that Defendant would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Wardrop's and Michigan Class members' Personal and Medical Information, including duties imposed by the FTC Act and HIPAA;

f. Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff Wardrop and Michigan Class members' Personal and Medical Information; and

g. Omitting, suppressing, and concealing the material fact that Defendant did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Wardrop's and Michigan Subclass members' Personal and Medical Information, including duties imposed by the FTC Act and HIPAA.

304. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of its data security and ability to protect the confidentiality of consumers' Personal and Medical Information.

CONSOLIDATED CLASS ACTION COMPLAINT

305.  Defendant intended to mislead Plaintiff Wardrop and Michigan Subclass members and induce them to engage in trade and commerce with Defendant and provide their Personal and Medical Information to Defendant in reliance on Defendant's misrepresentations and omissions.

306.  Defendant acted intentionally, knowingly, and maliciously to violate Michigan's Consumer Protection Act, and recklessly disregarded Plaintiff Wardrop and Michigan Class members' rights. Defendant's past data security incidents and widely publicized data breaches within the medical industry, as well as FTC and U.S. Department of Health and Human Services regulations and guidance, put Solara on notice that its security and privacy protections were inadequate.

307.  As a direct and proximate result of Defendant's unfair, unconscionable, and deceptive practices, Plaintiff Wardrop and Michigan Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial and health insurance accounts for fraudulent activity; loss of value of their Personal and Medical Information; and an increased, imminent risk of fraud and identity theft.

308.  Plaintiff Wardrop and Michigan Class members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $250, restitution, injunctive relief, and any other relief that is just and proper.

**M.    COUNT XIII – MICHIGAN IDENTITY THEFT PROTECTION ACT, Mich. Comp. Laws Ann. § 445.72, *et seq.* (on Behalf of Plaintiff Wardrop and an Alternative Michigan Class)**

309.  Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

310.  This Count is brought on behalf of Plaintiff Wardrop and an alternative Michigan Class.

-67-

311.    Defendant is a business that owns or licenses computerized data that includes "personal information" as defined by Mich. Comp. Laws Ann. § 445.72(1).

312.    Plaintiff Wardrop's and Michigan Subclass members' Personal and Medical Information includes Personal Information as covered under Mich. Comp. Laws Ann. § 445.72(1).

313.    Defendant was required to accurately notify Plaintiff Wardrop and Michigan Class members if it discovered a security breach, or received notice of a security breach (where unencrypted and unredacted Personal and Medical Information was accessed or acquired by unauthorized persons), without unreasonable delay. Mich. Comp. Laws Ann. § 445.72(1).

314.    Defendant was required to provide notice that was written in a "clear and conspicuous manner." Mich. Comp. Laws Ann. § 445.72(6).

315.    Because Defendant discovered a security breach and had notice of a security breach (where unencrypted and unredacted personal information was accessed or acquired by unauthorized persons) involving the Personal and Medical Information of Plaintiff Wardrop and Michigan Class members, Defendant had an obligation to disclose the Data Breach in a timely and accurate fashion as mandated by Mich. Comp. Laws Ann. § 445.72(4).

316.    By failing to disclose the Data Breach in a timely and accurate manner and provide notice clearly and conspicuously, Defendant violated Mich. Comp. Laws Ann. § 445.72(4).

317.    As a direct and proximate result of Defendant's violations of Mich. Comp. Laws Ann. § 445.72(4), Plaintiff Wardrop and Michigan Subclass members suffered damages, as described above. Plaintiff Wardrop and Michigan Class members seek relief under Mich. Comp. Laws Ann. § 445.72(13), including a civil fine.

consolidatedcomplaint

### N.    COUNT XIV – NORTH CAROLINA DECEPTIVE TRADE PRACTICES ACT, N.C. Gen. Stat. § 75-1.1, *et seq.* (on Behalf of an Alternative North Carolina Class)

318.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

319.    Plaintiff Harris brings this claim against Defendant on behalf of an alternative North Carolina Class.

320.    North Carolina law declares unlawful all "unfair or deceptive acts or practices in or affecting commerce" N.C. Gen. Stat. § 75-1.1.

321.    "Commerce" is defined broadly as any business activity other than "professional services rendered by a members of a learned profession." *Id.*

322.    Defendant's sale of medical devices constitutes commerce under North Carolina law.

323.    The North Carolina Identity Theft Protection Act required Defendant to provide individual notice to Breach Victims "without unreasonable delay." N.C. Gen. Stat. § 75-65(a).

324.    By failing to provide individual notice within 60 days of discovering the breach, as required under the HIPAA Notification Rule, Defendant's delay was unreasonable.

325.    Harris was injured by this delay, as he was subjected to a barrage of spam calls without knowing how they were able to know the private details of his Personal and Medical Information. This resulted in significant distress and anxiety. He was also prevented from protecting himself sooner. Other members of the alternative North Carolina Class were similarly injured.

326.    Defendant engaged in unlawful, unfair, and deceptive acts and practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the services purchased by Plaintiff Harris and the alternative North Carolina Class in violation of N.C. Gen. Stat. § 75-1.1, including but not limited to the following:

a.  Defendant misrepresented material facts pertaining to the sale of medical supplies to the alternative subclass by representing that they would maintain adequate data privacy and security practices and procedures to safeguard the Personal and Medical Information of the alternative subclass from unauthorized disclosure, release, data breach, and theft;

b.  Defendant misrepresented material facts pertaining to the sale of medical supplies to the alternative subclass by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the alternative subclass's Personal and Medical Information;

c.  Defendant omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for the alternative North Carolina Class's Personal and Medical Information;

d.  Defendant engaged in unfair, unlawful, and deceptive acts and practices with respect to the sale of medical supplies by failing to maintain the privacy and security of the alternative North Carolina Class's Personal and Medical Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Data Breach. These unfair, unlawful, and deceptive acts and practices violated duties imposed by laws including the FTC Act, 15 U.S.C. § 45 and HIPAA, 42 U.S.C. § 1302d, *et seq.*;

e.  Defendant engaged in unlawful, unfair, and deceptive acts and practices with respect to the sale of medical supplies by failing to disclose the Data Breach to the alternative North Carolina Class in a timely and accurate manner; and

consolidatedcomplaint

CONSOLIDATED CLASS ACTION COMPLAINT

f. Defendant engaged in unlawful, unfair, and deceptive acts and practices with respect to the sale of medical supplies by failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect the alternative North Carolina Class' Personal and Medical Information from further unauthorized disclosure, release, data breach, and theft.

327.   The above unlawful, unfair, and deceptive acts and practices by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

328.   Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the alternative subclass's Personal and Medical Information and that risk of a data breach or theft was highly likely. Defendant's actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the alternative North Carolina Class.

329.   As a direct and proximate result of Defendant's deceptive acts and practices, the alternative North Carolina Class members suffered an ascertainable loss, as described above, including the loss of their legally protected interest in the confidentiality and privacy of their Personal and Medical Information.

330.   Individuals injured by unfair or deceptive acts or practices are entitled to treble damages. N.C. Gen. Stat. § 75-16.

331.   Harris and the alternative subclass seek relief under N.C. Gen. Stat. §§ 75-1.1, *et seq.*, and request treble damages, attorney fees, expenses, and costs, and injunctive relief.

## O.  COUNT XV – INJUNCTIVE / DECLARATORY RELIEF

332.  Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

333.  This Count is brought under the federal Declaratory Judgment Act, 28 U.S.C. §2201.

334.  As previously alleged, Plaintiffs and members of the Class entered into an implied contract that required Defendant to provide adequate security for the Personal and Medical Information it collected from Plaintiffs and the Class.

335.  Defendant owes a duty of care to Plaintiffs and the members of the Class that requires it to adequately secure Personal and Medical Information.

336.  Defendant still possess Personal and Medical Information regarding Plaintiffs and members of the Class.

337.  Since the Data Breach, Defendant has announced few if any changes to their data security infrastructure, processes or procedures to fix the vulnerabilities in their computer systems and/or security practices which permitted the Data Breach to occur and go undetected for months and, thereby, prevent further attacks.

338.  Defendant has not satisfied its contractual obligations and legal duties to Plaintiffs and the Class. In fact, now that Defendant's insufficient data security is known to hackers, the Personal and Medical Information in Defendant's possession is even more vulnerable to cyberattack.

339.  Actual harm has arisen in the wake of the Data Breach regarding Defendant's contractual obligations and duties of care to provide security measures to Plaintiffs and the members of the Class. Further, Plaintiffs and the members of the Class are at risk of additional or further harm due to the exposure of their Personal and Medical Information and Defendant's failure to address the security failings that lead to such exposure.

340.   There is no reason to believe that Defendant's security measures are any more adequate now than they were before the breach to meet Defendant's contractual obligations and legal duties.

341.   Plaintiffs, therefore, seek a declaration (1) that Defendant's existing security measures do not comply with its contractual obligations and duties of care to provide adequate security, and (2) that to comply with its contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

   a. Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

   b. Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

   c. Ordering that Defendant audit, test, and train their security personnel regarding any new or modified procedures;

   d. Ordering that Defendant's segment customer data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

   e. Ordering that Defendant cease transmitting Personal and Medical Information via unencrypted email;

   f. Ordering that Defendant cease storing Personal and Medical Information in email accounts;

consolodatedcomplaint

g.  Ordering that Defendant purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services;

h.  Ordering that Defendant conduct regular database scanning and securing checks;

i.  Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

j.  Ordering Defendant to meaningfully educate its current, former, and prospective employees and subcontractors about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps they must take to protect themselves.

## VIII.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs and the Class pray for judgment against Defendant as follows:

a.  An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Class requested herein;

b.  A judgment in favor of Plaintiffs and the Class awarding them appropriate monetary relief, including actual and statutory damages, punitive damages, attorney fees, expenses, costs, and such other and further relief as is just and proper.

c.  An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

1

2          d.  An order requiring Defendant to pay the costs involved in
                notifying the Class members about the judgment and
3               administering the claims process;

4          e.  A judgment in favor of Plaintiffs and the Class awarding them
5               pre-judgment and post-judgment interest, reasonable attorneys'
6               fees, costs and expenses as allowable by law; and

7          f.  An award of such other and further relief as this Court may deem
8               just and proper.

9   **IX.    DEMAND FOR JURY TRIAL**

10          Plaintiffs hereby demand a trial by jury on all appropriate issues raised in this

11   Complaint.

12   DATED: January 23, 2020                    Respectfully submitted,

13
                                                By:  _/s/ William B. Federman_
14                                              William B. Federman*
                                                **FEDERMAN & SHERWOOD**
15                                              10205 N. Pennsylvania Ave.
16                                              Oklahoma City, OK 73120
                                                Telephone: (405) 235-1560
17                                              Facsimile: (405) 239-2112
                                                wbf@federmanlaw.com
18

19                                              Stuart A. Davidson*
                                                Christopher C. Gold*
20                                              Dorothy P. Antullis*
                                                Bradley M. Beall*
21                                              **ROBBINS GELLER RUDMAN**
                                                **& DOWD LLP**
22                                              120 East Palmetto Park Road, Suite 500
23                                              Boca Raton, FL 33432
                                                Telephone: (561) 750-3000
24                                              Facsimile: (561) 750-3364
                                                sdavidson@rgrdlaw.com
25                                              cgold@rgrdlaw.com
                                                dantullis@rgrdlaw.com
26                                              bbeall@rgrdlaw.com

27                                              *Interim Co-Lead Class Counsel for*
                                                *Plaintiffs*
28

consolodatedcomplaint

William M. Sweetnam*
**SWEETNAM LLC**
53 West Jackson Blvd, Suite 1400
Chicago, IL 60604
Telephone: (312) 757-1888
Facsimile: (312) 754-8090
wms@sweetnamllc.com

Cornelius P. Dukelow
**ABINGTON COLE + ELLERY**
320 South Boston Avenue, Suite 1130
Tulsa, OK 74103
Telephone and Facsimile: (918) 588-3400
cdukelow@abingtonlaw.com
*Pro Hac Vice Pending*

James R. Noblin
**GREEN & NOBLIN, P.C.**
4500 East Pacific Coast Highway
Fourth Floor
Long Beach, CA 90804
Telephone: (562) 391-2487
Facsimile: (415) 477-6710

*Plaintiffs' Steering Committee*

Kelly K. Iverson*
Eric D. Zard
**CARLSON LYNCH LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
kiverson@carlsonlynch.com
ezard@carlsonlynch.com
*Attorneys for Plaintiff Kristi Keally and
Proposed PSC Member, pending
Unopposed Motion to Consolidate*

*\*Pro hac vice* admitted

consolodatedcomplaint

CONSOLIDATED CLASS ACTION COMPLAINT